380 So.2d 970 (1979)
Tommy LEWIS
v.
STATE.
4 Div. 611.
Court of Criminal Appeals of Alabama.
September 4, 1979.
After Remandment January 22, 1980.
*971 Warren Rowe of Rowe, Rowe & Sawyer, John C. Dowling, Enterprise, for appellant.
William J. Baxley, Atty. Gen., and Elizabeth N. Petree, Asst. Atty. Gen., for the State, appellee.
PER CURIAM.
The capital felony conviction of the appellant is affirmed but the cause is hereby remanded for resentencing.
The facts of this case are hereinafter set out in a separate opinion by Judge LEIGH CLARK, retired circuit judge serving as a judge of this court under the provisions of the Judicial Article, Amendment No. 328, to the Constitution of Alabama 1901. This court adopts Judge Clark's opinion as the opinion of the majority with the exception of that portion which holds that this court may reduce the death penalty and, on its own, sentence the appellant to life imprisonment without parole. (Opinion attached as Appendix)
This court must independently weigh the aggravating and mitigating circumstances in a capital case. Neal v. State, Ala.Cr.App., 372 So.2d 1331 (1979), cert. den. Ala. 372 So.2d 1348 (1979); Rule 45, A.R.A.P. In doing so, we do not substitute our judgment for that of the trial judge any more than we do that of a jury in reviewing the sufficiency of the evidence. Kent v. State, Ala.Cr.App., 367 So.2d 508 (1978).
As pointed out in Judge Clark's opinion, the death penalty is not sustained by the evidence presented at the hearing on aggravating and mitigating circumstances. However, this court does not have statutory authority to reduce the penalty and resentence the appellant itself. That duty is vested in the trial court, § 13-11-4, Code of Alabama 1975, subject to our review on appeal. "The judgment of conviction and sentence of death shall be subject to automatic review as now required by law." § 13-11-5, Code of Alabama 1975. [Emphasis supplied].
We additionally point out, as in the companion case of Colley v. State, Ala.Cr. App.; (Ms. Sept. 4, 1979), the findings of fact that the robbery was committed (1) for "pecuniary gain" and (2) that the killing was "unnecessary," are inappropriate. The first for the reason that it was held to be so by our Supreme Court in Cook v. State, Ala., 369 So.2d 1251 (1978), and the second, because it is not listed as an aggravating circumstance in § 13-11-6. Another sentencing hearing is therefore mandated.
Affirmed in part; Remanded with Directions.
HARRIS, P. J., and DeCARLO, BOOKOUT and BOWEN, JJ., concur.
TYSON, J., concurs in part, dissents in part.
*972 TYSON, Judge, concurring in part; dissenting in part.
I agree with my distinguished brothers that this court must weigh independently the aggravating and mitigating circumstances under the Alabama Death Penalty Statute.
I would vote, however, to uphold in full the opinion prepared for this court by Judge LEIGH CLARK, as I believe this court, in an appropriate case, can modify a sentence in a death case only on authority of Hubbard v. State, 290 Ala. 118, 274 So.2d 298 (1973); Hubbard v. State, 290 Ala. 120, 274 So.2d 301 (1973); Lokos v. State, 290 Ala. 122, 274 So.2d 303; Swain v. State, 290 Ala. 123, 274 So.2d 305 (1973).

APPENDIX
LEIGH CLARK, Retired Circuit Judge.
Appellant-defendant was indicted, tried and convicted under the Death Penalty and Life Imprisonment Without Parole Act (Acts of Alabama 1975, No. 213), now contained in Ala.Code 1975, § 13-11-1, et seq. He was charged with intentionally killing James O. Counts, Jr., also known as Junior Counts, by shooting him with a pistol, while robbing him. In compliance with § 13-11-2 of the Act, the jury fixed his punishment at death.
Pursuant to § 13-11-3 and § 13-11-4 of the Act, the trial court conducted a hearing "to aid the court to determine whether or not the court will [would] sentence the defendant to death or to life imprisonment without parole" and thereupon, after weighing the aggravating and mitigating circumstances, the court determined that defendant's punishment should be death, and sentenced him accordingly.
Our review of the record convinces us that the death sentence should be reduced to a sentence to life imprisonment without parole. By reason of such determination, we limit our discussion in the main to considerations bearing materially upon the question of the appropriate alternative punishment, under all the circumstances, for the conviction of defendant for the crime committed.
On the afternoon of July 8, 1977, about 3:20 P.M. James O. Counts, Jr., was robbed and killed at his service station on Highway 84, commonly called the Dothan to Enterprise Highway. He was found soon thereafter lying with his face down behind the counter, in a pool of blood. An autopsy showed that two bullets had entered his back and a third wound from the bullet of a pistol was found in his upper left chest. The cause of his death was determined to have been acute internal hemorrhage subsequent to and originating from multiple gunshot wounds to the body.
There was ample evidence to support the conclusion of the jury that defendant was a participant in the robbery and the intentional killing of Mr. Counts. His fingerprints were found in the store; the pistol that was used in the killing was one that defendant delivered to defendant's sister, who in turn delivered it to the authorities, after the crime; many other circumstances such as defendant's presence at significant times at the particular service station, and at places in outlying areas, pointed to him and one Kelly Colley as the persons who had robbed and killed Mr. Counts. In addition, defendant confessed to his participation in the crime but denied actually firing the pistol. He first stated that a third person by the name of Franklin participated in the crime and actually fired the pistol, but the evidence as a whole shows that only two, in addition to the victim, were present at the time of the commission, and that they were defendant and Colley.
Defendant pleaded both not guilty and not guilty by reason of insanity. The record shows that the special defense of not guilty by reason of insanity was chiefly relied upon by defendant. Furthermore, the record shows that from the beginning of the proceedings until the sentence imposed upon defendant, the question of the mental condition of defendant was a matter of ceaseless serious concern, so much so that the trial court, acting pursuant to Ala.Code 1975 § 15-16-21 suspended the trial of defendant until a jury had determined whether *973 he was competent to stand trial. It is to be noted that such a determination is required by said § 15-16-21 if "the trial court shall have reasonable ground to doubt his sanity." The jury determined that defendant was competent to stand trial.
The evidence as to defendant's mentality was approximately the same on the hearing as to his mental competency to stand trial as it was on the trial on the issue of his guilt or innocence as raised by his special plea of not guilty by reason of insanity. The testimony from law enforcement personnel on the point, chiefly from those who had participated in the investigation, apprehension or detention of defendant, was to the effect that in their contact with and their observations of, defendant he had appeared to them mentally alert and capable, and with no apparent mental handicap.
On the hearing, attended by all concerned, as to the sentence to be imposed by the court after the verdict of the jury, the State offered the testimony of law enforcement personnel, including some who had not previously testified, who had observed defendant at times between the date of the crime and the pre-sentence hearing. They testified that defendant appeared to them to be alert and responsive. In addition, a detective of the Montgomery Police Department testified that he had known defendant since 1975, a short time prior to the detention and conviction of defendant for the crime of assault with intent to murder, and that defendant "appeared to be very alert." Upon being asked whether defendant appeared to have any physical or mental incapacity, he replied, "Not to me." Some of the witnesses testified that defendant was allowed to make, and did make without assistance, phone calls from the jail, including a long distance call after he was convicted in the case now under consideration.
At the conclusion of the testimony offered by the State on the pre-sentence hearing, the following occurred:
"MR. STEPHENS: That's all for the State.
"THE COURT: You got anything you want to present, Mr. Rowe?
"MR. ROWE: Your Honor, the only thing we would have, we would submit what Dr. George[1] has already put in the record in front of this Court and the defendant's age, nineteen years old.
". . .
"THE COURT: Well, the officer testified that his date of birth was 22 October, '57.
"MR. STEPHENS: Right.
"THE COURT: Is there any dispute as that being the date of birth?
"MR. ROWE: None that I know of.
"THE COURT: Now, I want to say something to this defendant, because I realize you gentlemen are representing him by appointment...."
The material omitted from the last quoted portion of the record consists of three pages of a statement by the court to the defendant, a commendable and appropriate statement, directing defendant's attention to the seriousness and importance of the hearing and of defendant's being afforded every opportunity to present his side of the pending issue, which ended as follows:
"I'll ask you this question: Do you under-what I have just stated?
"DEFENDANT LEWIS: Yes, sir.
"THE COURT: Would you like to have a few minutes or any length of time to confer with your lawyers?
"DEFENDANT LEWIS: Yes, sir.
"THE COURT: Please take it.
"Thereupon defendant and his attorneys retired from the courtroom to confer in private and after some time returned. Both he and his counsel said that defendant `did not want to take the stand.'"
Although defendant offered no evidence on the presentence hearing, it seems that it was distinctly understood, as it should have been, that as to the then pending question, the court would take into consideration not only the evidence presented on the pre-sentence hearing, but also the evidence that had been previously presented and all pertinent *974 matters that had theretofore come to the attention of the court. In responding to the statement of counsel for defendant that the court consider the testimony of Dr. George, who had testified for defendant on the main trial and on the hearing to determine defendant's competency to stand trial, the court said:
"THE COURT: Mr. Rowe, as I understand the whole ball of wax, we consider the whole record. Not only what was offered here but the total scope. Your request that we pay particular attention to whatever Dr. George testified to certainly will be complied with in formulating any judgment...."
From the beginning of the case until the end, it appeared that defendant relied chiefly upon the testimony of Dr. Fred George, a clinical psychologist practicing his profession in Enterprise. Defendant had requested, but had not obtained, an order of court pursuant to Ala.Code 1975 § 15-16-22, for the initiation of process aimed toward the appointment of a Commission on Lunacy "with the view of determining the mental condition of such defendant and the existence of any mental disease or defect which would affect his present criminal responsibility or his criminal responsibility at the time of the commission of the crime." Appellant insists that the court's denial of defendant's request or motion in this respect pervades the record to the extent of constituting error requiring a reversal of the judgment. We disagree, but we believe that presentation of such a motion, in the early stages of the case, and some of the evidence on the hearing of the motion, have an important bearing upon any question as to the correctness of our decision. We will attempt further reference thereto in this opinion, but for the time being we merely note the fact, of some significance we think, that at the time of the hearing on the motion looking toward the appointment of a lunacy commission, defendant, an indigent, had not been examined by Dr. George.
Dr. George was the only witness who testified as an expert on the subject of sanity or mental ability. He did so at length at the competency hearing and on the trial as to defendant's guilt or innocence. He is a Ph.D. in psychology, with a major in clinical psychology from the University of Texas; he attended undergraduate school at the University of Pennsylvania. At the time of his testimony he had been practicing his profession for six years, for the United States Army at Ft. Rucker for four years and thereafter in private practice. He professionally examined defendant on November 21, 1977, a few days only before the hearing as to defendant's mental competency to stand trial.
According to Dr. George, his professional examination of defendant consisted chiefly of an interview with defendant and two tests that he gave defendant, one the Wechsler Adult Intelligence Scale and the Rorschach Ink Blot test. He testified that based on the clinical interview and the testing, defendant "is retarded and retarded in the level of not being able to think abstractly, not being able to produce concepts. There is also evidence of very poor reality contact and the clinical view is consistent with psychotic behavior also." He stated emphatically that in his opinion defendant was not "able to help prepare his own defense"; that he was not "mentally capable or mentally competent to stand trial" at that time. When asked whether in his opinion defendant was faking during the interview when the tests were given him, Dr. George said, "My opinion is that it is the valid examination, and I have that on several things." He further said:
"The Vershock[2] has a number of characteristics that are typical of people who are retarded, and like I said it would be almost impossible for me to imagine that a person with a seventh grade education could know what to give me on Vershock. Number 2, was my observation of his behavior and there were a number of unusual mannerisms, talking to himself, *975 mumbling to himself. I didn't hear words. Distractability from one thing to another. The disorientation to the times. Not remembering my name. His total disinterest, as would seem to me, a disinterest in what we were doing and indifference to it. It was just an overall impression you get as to the validity or invalidity of it. I suppose I could be fooled, but based on my experience my total evaluation is that it was a valid indicator.
". . .
"Are you asking me if I thought he faked it? No. Did I feel like he was trying to give me a snow job? No. He seemed to be pretty disinterested in what was going on around him and pretty much in his own world. I should mention that I saw many people in the Army who were malingering trying to get out and we got relatively good at
"Q So you are familiar with fakers and malingerers, and in your opinion is this man a faker?
"A No."
According to the testimony of Dr. George, in referring to the Wechsler test administered to defendant:
"The average score for an IQ test is 100. A score of 65 would put him in the bottom one percent of the population. But, his [defendant's] score is 45 which would approximately put him in the bottom one-tenth of one percent, which would mean out of a thousand people if we tested them his score would be the lowest or the second lowest or possibly even the third lowest."
In referring to the Rorschach test, Dr. George testified:
"On this score, his score was twenty-five percent for those responses which just use the shape of the blot and twenty percent for his total score. Now, the score by itself doesn't mean anything. The twenty-five percent and the Twenty percent. What we do is go to our table compiled by Dr. Exner on different patient groups. On people, non patients we will say that instead of normalbut, in non patients the average score for the reality testing is either eighty-one percent just using the shapes, and eighty-nine percent using theI'm sorry. Eighty-one percent for all the responses and eighty-nine percent for just using the shape."
The witness compared the defendant's score of twenty-five percent and twenty percent to sociopaths who would score seventy-five percent on all responses and eighty-five percent for "just using shapes." He also compared defendant's score with "inpatient schizophrenics," who he said generally scored fifty-seven percent for all responses and sixty-two percent as to shapes, that defendant's "scores were in the bottom one percent of hospitalized schizophrenics." He said that his evaluation of defendant's "ability to perceive reality, based on his tests is well below that of a typical five and six year old. Even those with behavior problems."
Dr. George was the only witness called by the defendant on the trial as to his guilt or innocence. The only evidence in the case as to the mental condition of defendant, in addition to the testimony of Dr. George and the law enforcement officers discussed above, was some testimony of defendant's sister, who testified as a witness for the State as to the pistol turned over to her by defendant after the crime involved. On cross-examination, her testimony was in part as follows:
"Q And you have observed Tommy how old is Tommy now?
"A Tommy is about twenty.
"Q How many brothers and sisters?
"A There is eight of us in all.
"Q Have any of you ever been to a mental institution?
"A Yeah, I have been to Mt. Vernon and I have got a brother been in there ever since he was nine.
"Q Is he still in that mental institution?
"A He got out when he was twenty-nine.
"Q Is Tommy's mother still living?
"A No, she has been dead ever since Tommy was about nine or eight.

*976 "Q Have you observed Tommy's demeanor over the years that you have known him as your brother?
"A Tommy has always been disturbed.
". . .
"Q Mrs. Thornton, do you have an opinion yourself as to whether or not Tommy ought to go to seek medical attention?
"A It helped me. I think he should have went too.
"Q Do you think he needs medical attention now?
"A Yes, I do.
". . .
"Q Have you observed Tommy for nineteen years?
"A Except when he was in the hospital.
"Q Is this a normal position for Tommy?
"A No.
"Q How is Tommy's normal attitude?
"A Before Momma died he was real nice and talked a lot and stuff like that. Always talked and laughed, but when she died he just.
"Q How old was he when she died?
"A He was about eight or nine.
"Q Has he been kind of like this ever since?
"A Yes, because he put my sister's hair on fire and do all crazyhe burnt my stomach when I was laying in the bed.
"Q Do you have an opinion whether or not Tommy is crazy?
"A Something is wrong with him. I am definitely sure of that."
There is some vagueness as to how much schooling defendant had, some of the evidence indicating that he went to or through the seventh grade. His sister testified:
"The teacher put him out of school when he was in about the third or second grade.
"Q Did he go to regular school or was he in a special education class?
"A Special education. I was too. Both of us."
The evidence indicates that defendant had been living with his father, in Montgomery, prior to the death and robbery of Mr. Counts. The evidence further indicates, although it does not positively show, that defendant's father was not at the trial and took no action in regard to the case.
Upon allocution upon rendering judgment of conviction and thereafter upon sentencing the defendant, his reply was:
"I ain't kilt nobody."
In determining that defendant's punishment should be death instead of life imprisonment without parole, the court found as follows:
"The capital felony was committed by the nineteen-year-old Tommy Lewis while he was engaged or was an accomplice in the commission of robbery of James O. Counts, Jr., for pecuniary gain.
"The intentional death of James O. Counts, Jr., was especially heinous, atrocious, and cruel as these terms are understood by ordinary men. The death of James O. Counts, Jr., was unnecessary.
"Tommy Lewis' participation in the corpus delicti of the intentional capital felony was with another. Participation by Tommy Lewis was not under duress or domination of any other person. Participation by Tommy Lewis in the capital felony was significant, major and voluntary.
"Tommy Lewis has a significant history of prior criminal activity. He has been heretofore lawfully convicted of a felony involving use of violence to the person of another.
"At the time of trial Tommy Lewis was twenty years of age. The pitiless acts of Tommy Lewis in the intention capital felony were voluntary and with capacity to appreciate the criminality of his motive for unlawful pecuniary gain.
"The age of Tommy Lewis is insufficient to outweigh the aggravating circumstances heretofore found to exist."
Notwithstanding the obviously careful and conscientious action of the trial court, we are unable to agree with his conclusion that the punishment fixed by the jury under the statute should not have been reduced to life imprisonment without parole. In so deciding we endeavor to accord the trial judge, by reason of his opportunity for *977 observation of the witnesses and the defendant for a long period of time, a point of vantage over appellate judges to determine the particular issue decided. Even so, after due deference to the mentioned factor in favor of the trial court, we cannot thrust aside our own judgment in the matter. It seems clear that the rights of a defendant under the Death Penalty and Life Imprisonment Without Parole Act are not adequately protected if the court on appeal permits itself to become bound by the judgment of the trial court on the issue. We cannot say in this case, as we have said in other cases under the mentioned Act, that it is the opinion of this Court, taking the particular Act in its fullness, and all the circumstances of this case, into consideration, that appellant should be sentenced to death instead of life imprisonment without parole.
As stated by Judge Bowen in his concurring opinion in Neal v. State, Ala.Cr.App., 372 So.2d 1331 (1979):
"The import of Jacobs v. State, 361 So.2d 607 (Ala.Cr.App.1977), affirmed, 361 So.2d 640 (Ala.1978), and Clements v. State, 370 So.2d 708 (Ala.Cr.App.1978), reversed on other grounds, 370 So.2d 723 (1979), is that this Court must independently weigh the aggravating and mitigating circumstances to determine whether they are sufficient to support a sentence of death."
Weighing heavily with us is the undisputed testimony as to the mentality of appellant. By stating, "undisputed," we do not mean to imply that there was not a just basis for the verdict of the jury as to defendant's mental competency to stand trial and the verdict of the jury that said in effect that he was not insane at the time of the commission of the crime. We greatly appreciate the value of the testimony of lay witnesses, as well as testimony of expert witnesses, on an issue as to mental competency or sanity. The weight of each kind of evidence as compared with the other is variable. By reason of the variety of circumstances, lay testimony is weightier at times than expert testimony, and at other times the reverse is true. In the final analysis, a jury is generally the best judge of the issue, and in this particular case, we do not say that the verdict of the jury, either on the competency hearing or on the guilt or innocence trial, was wrong or unjust. On the post-verdict, pre-sentence hearing, however, the extent of sub-normal mental capacity does not have to measure up to the applicable test necessary to show a lack of sufficient competency to stand trial or a state of insanity that makes one incapable of committing a crime. Two specific mitigating circumstances are important factors and are prescribed by § 13-11-7 of the Death Penalty and Life Imprisonment Without Parole Act. They were not addressed directly by the trial court. They are:
"(2) The capital felony was committed while defendant was under the influence of extreme mental or emotional disturbance;...
(6) [t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;"
The existence of both of said mitigating circumstances does not necessarily require the reduction of punishment from death to life imprisonment without parole. Such circumstances and other mitigating circumstances must be considered with, and weighed against, aggravating circumstances and the extent of the aggravation of such circumstances.
The sub-normality of defendant's mind was so great, we think that the fixation of his punishment at death should not be allowed to stand. We are so persuaded by the evidence as a whole. In addition, we note as worthy of comment and consideration some testimony of one of his attorneys:
"Q Mr. Dowling, in response to that, his objections, on the several occasions that we have seen this man, just basic simple questions how many times would you have to ask him where he was born, his date of birth? How long would it take you to get a response to that if you got it?
*978 "A On basic simple questions like when he was born, birth date, things of this nature, you would have to ask him three, four, five times and then he would answer it in an irrational manner.
"Q When we explained to Mr. Lewis what he was charged with and what we were there for how many times did you have to explain that to him?
"A Four or five times at least.
". . .
"Q Have you talked to Mr. Lewis this morning?
"A Yes, I have.
"Q Did you try to explain what we are here for this morning?
"A Approximately five minutes ago we tried to explain to Mr. Lewis what we were doing here today as we have done in the past and he does not understand why he is here or why he is in jail.
". . .
"Q Now, Mr. Dowling, were you able to explain to him why we are here this morning?
"A No, sir, I was not.
"Q Did you explain to him that we are up here to determine whether or not he should be examined or see whether he is sane or insane?
"A We attempted to explain to him, but I don't think he understands why he is here. I don't think he has the intellect to understand any of this."
A point was made by the district attorney to the effect that defendant's counsel should not have acted both as his counsel and as a witness in his behalf. This is not for us to decide, but we find no contention by the State, the trial court or here, that tends in any way to discredit the testimony of defendant's counsel.
We are favored by a record of the argument in full of counsel for the State and counsel for the defendant as they addressed the jury at the conclusion of the trial. We agree with the argument of counsel for the State, and can fully understand the favorable impression it made upon the jury, that the burden of proof as to the issue of insanity on the trial was upon the defendant. We find no insistence on the trial, and none has been made here, to the effect that there was any burden on either party, at the pre-sentence hearing, as to defendant's mental condition.
It appears that there was no contention by the State that Dr. George was not an able psychologist. In the closing argument of State's counsel, it was stated:
"Dr. George, there is absolutely no question in my mind is a fine psychologist. I don't argue with that. I don't argue with any of their testing devices or vehicles that they use. That is probably called for in some way and I don't understand it...."
If this were a case in which the evidence shows that a crime was committed that demonstrated acumen on the part of the criminal, we would not be as convinced as we are of the low mental score of appellant when tested by any recognized standard. That his mind was innately criminal, we have no doubt; that it was far down the scale of intelligence we are fully convinced. The judgment of conviction should be affirmed, but the sentence should be reduced to life imprisonment without parole.
Contentions of appellant in addition to those discussed above have been considered, but, as to any that have merit, we are of the opinion that a serious problem exists as to whether the questions now raised by the contentions were raised in the trial court. If not a reversal of the judgment would not be precluded if the death sentence were upheld. Ala.Code 1975, § 12-22-241 and authorities there cited. As the death penalty is not upheld by this opinion and judgment we deem it appropriate to forego for the time being determination of other contentions not determined above.

AFTER REMANDMENT
DeCARLO, Judge.
In response to our remandment and in conformity with our opinion in this case, supra, the circuit court of Coffee County *979 (Enterprise Division), conducted another sentencing hearing and re-sentenced the appellant.
The trial court, in compliance with our opinion, supra, made the following written findings:
"STATE OF ALABAMA, )
 IN THE CIRCUIT COURT OF
 "Plaintiff )
 COFFEE COUNTY, ALABAMA
 "vs. )
 ENTERPRISE DIVISION
 "TOMMY LEWIS )
 Case No. CC 77-25
 "Defendant )
"Tommy Lewis was convicted of robbery when the victim was intentionally killed. The jury fixed the punishment at death. This Court held a sentencing hearing to aid the Court to determine whether or not Lewis would be sentenced to death or to life imprisonment without parole as required by Section 13-11-3, Code 1975. This Court after weighing the aggravating and mitigating circumstances accepted the death penalty as fixed by the jury and sentenced the defendant to death. Section 13-11-4, Code 1975. The judgment of conviction and sentence of death was subject to an automatic appeal to the Alabama Court of Criminal Appeals. The Alabama Court of Criminal Appeals on September 4, 1979, affirmed the capital felony conviction, reversed the sentence of death and remanded the case to this Court with directions for another sentencing hearing by this Court.
"The new sentencing hearing was held on October 4, 1979. The evidence originally submitted in 1977 at the first sentencing hearing was offered with new evidence consisting of testimony of Jerry Scarbrough and Grady Reeves which is cumulative in nature and scope to the evidence on the first hearing, and four judgments of conviction for second degree burglary and one judgment of conviction for grand larceny obtained on guilty pleas entered by Lewis in Pike County Circuit Court subsequent to the sentence of death in 1977. The Court could not and did not consider pending unadjudicated felony charges in imposing sentence in 1977. Cook v. State, Ala.Cr.App., 369 So.2d 1243, Ala., 369 So.2d 1251, Ala.Cr.App., 369 So.2d 1260 (1978). Thus, the relevant evidence before the Court at this time is essentially the same as in 1977.
"In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), it was declared that the imposition of death by public authority is so profoundly different from all other penalties, that an individualized decision is essential in capital cases.
"The aggravating circumstances are:
"That Lewis committed the capital felony while he was engaged or an accomplice in the commission of robbery; and
"That Lewis was previously convicted of a felony involving the use of violence to the person.
"The Alabama Court of Criminal Appeals concluded two specific mitigating circumstances require life imprisonment of Lewis without parole. They are:
"That Lewis committed the capital felony while under the influence of extreme mental or emotional disturbance; and
"That the capacity of Lewis to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
"The Alabama Court of Criminal Appeals, on page two of its judgment reversing the sentence of Lewis to death declared:
"As pointed out in Judge Clark's opinion, `the death penalty is not sustained by the evidence presented at the hearing on aggravating and mitigating circumstances.'
"On page sixteen of the judgment, it is also stated:
"`The sub-normality of defendant's mind was so great, we think, that the fixation of his punishment at death should not be allowed to stand. We are so persuaded by the evidence as a whole . . .'
"The directions given the trial judge as the sentencing authority by The Alabama Court of Criminal Appeals in reversing *980 the death sentence of Lewis are more than adequate to enable him to weigh the aggravating circumstances against the mitigating circumstances. The judgment rendered by this Court is founded upon the directions of The Alabama Court of Criminal Appeals that the sentence of death would not be sustained on evidence essentially the same in nature which has been declared inadequate to sustain a sentence of death by The Alabama Court of Criminal Appeals; the aggravating circumstances; the mitigating circumstances found to exist by The Alabama Court of Criminal Appeals; and the mandate to this Court by The Alabama Court of Criminal Appeals reversing the sentence of death for the sub-normality of the mind of Lewis.
"IT IS, THEREFORE, ORDERED AND ADJUDGED BY THE COURT, that the mitigating circumstances outweigh the aggravating circumstances, and that Tommy Lewis, for the capital felony of robbery when the victim is intentionally killed, is sentenced to life imprisonment without parole, which shall be served without parole.
 "DONE AND ORDERED this 13th day
of November, 1979.
 "/s/ Riley Green____________
 "CIRCUIT JUDGE
 "FILED IN OFFICE
 THIS THE 13th Day
 of November, 1979
 "/s/ Jim Ellis_______________
 "REGISTERCLERK
 CIRCUIT COURT,
 COFFEE COUNTY ALA."
Therefore, the judgment of conviction and sentence by the Coffee Circuit Court (Enterprise Div.) is affirmed.
AFFIRMED.
HARRIS, P. J., and DeCARLO, BOOKOUT and BOWEN, JJ., concur.
TYSON, J., concurs in result only.
NOTES
[1] Dr. Fred George, whose testimony is hereinafter treated.
[2] It is understood that the name is incorrectly spelled in the record and that the reference is to Herman Rorschach (1884-1922), of renown in psychodiagnostics.