The appellant was convicted of the capital offense of murder during a robbery in the first degree, or an attempt thereof, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. Following a sentencing hearing, the jury recommended that the appellant be sentenced to death, by a vote of 11 to 1. Thereafter, the trial court held a separate sentencing hearing, pursuant to §13A-5-47, Code of Alabama 1975, following which the trial court determined that the appellant should be sentenced to death by electrocution.
The record indicates that the pertinent facts of the case are as follows: On February 23, 1988, a black "Boss" 1983 Ford Mustang automobile, without a license tag, was stolen from Connie's Quik Mart, in Chattanooga, Tennessee. The robbery occurred a short distance from the house trailer of the sister of Colon Lavon Guthrie, the appellant's alleged accomplice.
The appellant and another man arrived at the residence of L.G. Windsor, the appellant's uncle, in New Hope, Alabama, in Madison County. Although L.G. Windsor was uncertain of the date of the visit, he testified that he believed it was in the latter part of February. Windsor testified that sitting in his yard was a badly wrecked 1976 Ford Mustang automobile, which he had received from the appellant as a trade. Windsor testified that, before he saw the appellant and the other man at his home, the 1976 Mustang had had a tag on it. Windsor testified that, on that occasion in late February, he observed the two men run from the 1976 Mustang back to their car, which was a more recent model Ford Mustang with a 302 cubic inch engine in it. Windsor testified that he approached the appellant and the other man to see "what they might have got from running out of the woods" and under the belief that the appellant "might have stole [sic] [the] battery or something" from the 1976 Mustang. Windsor testified that he noted that the Mustang that the appellant and the other man were traveling in did not have a tag. Windsor further testified that, the day after the visit, he noticed that the wrecked 1976 Mustang no longer had a tag.
On February 25, 1988, Robert Hester, of Moulton, Alabama, testified that he was returning to Moulton from Cullman, Alabama. En route, he observed a black Ford Mustang automobile or a Capri automobile driving erratically. He testified that the vehicle passed him at a high rate of speed. Hester testified that he noticed the vehicle's tag number, because it was from Jackson County where he had grown up. He testified that because of the vehicle's reckless driving, he wrote down the tag number on a business card. Hester testified *Page 89 
that he continued to follow the vehicle until it pulled off at a small grocery store. He testified that the next day he telephoned the Alabama State Troopers' office with a description of the vehicle, including the tag number. The tag number was subsequently traced back to the 1976 black Mustang, which the appellant had at one time owned and which he had subsequently traded to L.G. Windsor.
Michael Wayne Maxwell, of Colbert County, Alabama, testified that he was acquainted with the victim's family, pursuant to the victim's employment at the Chiska Service Station, a gasoline service station that also included a small convenience store. At 7:30 p.m., on February 25, 1988, Maxwell left his home to drive to the Chiska Station to purchase some cold medicine. He stopped at his cousin's home for approximately five minutes, and then picked up a hitchhiker, dropped him off, and arrived at the Chiska Station at approximately 8:00 p.m. Maxwell testified that he observed a black Mustang automobile, with its engine running, parked outside the full-service island, close to the building. He testified that it appeared to be an early 1980's model Mustang and that "The Boss 302" was written on the driver's side door. He testified that one man was sitting in the passenger's seat with the passenger's door open, while a second man was inside the store near the ice cream box. Maxwell testified that he put some gasoline in his car and then started towards the store. The man who had been sitting inside the black Mustang walked into the store ahead of him. He testified that the two men began whispering to each other by the ice cream box and that the man who had been sitting in the Mustang walked back outside. The other man, accompanied by the victim, Randall Pepper, who worked in the store, walked over to the shelf where the oil and transmission fluid was located. The man told the victim to wait on Maxwell first. Maxwell testified that, as he left the store, the man who had been inside followed him outside, holding two quarts of transmission fluid, for which he had not paid. Maxwell testified that the other man was sitting in the car, with the car door open, eating a "Nutty Buddy" or "a Drumstick" ice cream cone. Maxwell testified that he thought that that was odd because the temperature was approximately 40 degrees Fahrenheit. Maxwell testified that the man with the motor oil stood and watched as Maxwell drove away. Maxwell testified that approximately 10 minutes after he left the store he learned of the victim's death.
The victim's home was close to the service station. His family included a son, 17 years of age, and a wife. At approximately 7:30 p.m., on February 25, 1988, the victim's son, Tommy, took his father his supper at the service station. He talked to his father for a short while and then returned home, where he took a shower and changed into his nightclothes. Tommy testified that at approximately 8:00 p.m. he was watching television, when he heard a loud noise, as if a gunshot had been fired. He immediately ran toward the store to check on his father. He observed a car sitting at the full service island and a man running out of the store. He described the vehicle as being dark brown, with racing stripes, square taillights, tinted windows, and a fin in back. He testified that he believed the vehicle to have been a Dodge automobile, because a friend of his drove a similar vehicle. Tommy further testified that he observed another figure inside the vehicle on the driver's side. He subsequently identified in a photographic lineup the man he saw running from the store, as the appellant.
The victim's wife testified that, on the night in question, she was in their home, where she had prepared supper. She testified that she remained in the house while her son took the victim his supper. She testified that, at approximately 7:55 p.m., she heard a loud explosion, which sounded like a gunshot. She rushed out to her car and quickly drove to the service station. She testified that she observed a man at the back of what appeared to be a dark gray vehicle, and a second man running from the store, jumping and laughing. She testified that this second man had something in his right hand, which he held low, but she was unable to identify what it was. *Page 90 
Tommy and his mother found the victim lying on the floor, with a gunshot to the right side of his head; they could find no pulse.
On February 26, 1988, at approximately 10:00 p.m., the black "Boss" Mustang was recovered in Chattanooga, Tennessee, in the same area from which it was stolen. Although the vehicle was initially treated as having been the subject of a simple robbery, it was later connected to this offense and searched. A cigarette butt with the appellant's fingerprints on it was found in the Mustang. Also found were the remains of an old ice cream cone. The victim's wallet was also found in the vehicle.
On March 6, 1988, the appellant and Colon Lavon Guthrie were arrested at a rest area in Tennessee. A semi-automatic sawed-off shotgun was recovered from the front seat of the vehicle which the appellant was driving when he was apprehended. Although the victim was killed by a wound that was inflicted by a shotgun, the State's expert testified that he did not believe the sawed-off shotgun recovered from the car was the murder weapon. The appellant was searched pursuant to his arrest and a .25 automatic model P-25 Raven gun was removed from his person. This gun was subsequently identified as having belonged to the victim and was determined to have been missing since immediately after his death.
Although the appellant did not testify at trial, he presented the testimony of two witnesses in order to establish an alibi defense for the night of the murder.
 I
The appellant argues that, during the prosecutor's closing argument to the jury, the prosecutor made an improper comment on the appellant's failure to testify, thereby violating his constitutional rights and depriving him of a fair trial. The record indicates that during his closing argument, the prosecutor stated as follows:
 "And the strongest piece of circumstantial evidence that you have in this case, and [defense counsel] just glossed over this — State's Exhibit No. 31 [the victim's gun], it has been identified a number of ways in this case, but they can't explain this — they can't explain why this weapon was in the defendant's pocket when he was arrested. Can you offer me another reasonable hypothesis as to how that weapon got there?"
Immediately following the prosecutor's closing argument, the defense counsel asked to be allowed to make objections to the prosecutor's closing argument outside the hearing of the jury. The defense counsel objected as follows:
 "At this time the defendant objects to that portion of the State's closing argument wherein the State, pointing to the defendant, said, 'They cannot explain why he had the deceased's pistol in his possession at the time of his arrest.' And the defendant moves for a mistrial on that basis and on the basis that that refers to the failure of the defendant to testify in his own defense."
The prosecutor responded that his comment was meant to be a reference to defense counsel's closing argument, in that the defense counsel "glossed over any explanation of how the gun could have gotten there." Thereafter the following transpired:
 "[DEFENSE COUNSEL]: The record will speak for itself as to what the district attorney said. The only thing I'm making a point is that the district attorney pointed to the defendant in making the statement that he made that he cannot explain why he had the deceased's pistol in his possession at the time of his arrest.
 "[PROSECUTOR]: The record doesn't show who I pointed to, but I think I pointed to [defense counsel].
 "[DEFENSE COUNSEL]: Well, I know otherwise; I think I know otherwise and I don't know if the Court observed it. But it's my opinion and I will so swear that he pointed to the defendant.
"BY THE COURT: Anything else?
 "[PROSECUTOR]: Well, I say that I pointed at [defense counsel] and I think that if you read that in context, you will see that I was referring to [defense counsel *Page 91 
I was referring to the fact that he glossed over the possession of the weapon and the defendant.
 "BY THE COURT: Anything else? The motion is denied."
No curative instructions were given by the court in reference to the prosecutor's statement or gesture.
"[W]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of defendant to testify, § 6 [Constitution of Alabama of 1901] is violated." Beecher v. State, 294 Ala. 674, 320 So.2d 727, 734
(1975). "Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated." Padgett v. State, 45 Ala. App. 56, 223 So.2d 597, 602
(1969), cert. denied, 284 Ala. 732, 223 So.2d 603 (1969). Thus, it becomes important as to whether the appellant alone could have provided the missing evidence. Id. 223 So.2d at 603 ("in view of the testimony showing that only [defendant] and his co-defendant could deny the testimony . . . [the prosecutor's remark that certain testimony was uncontradicted] did raise a danger that the jury would draw an improper inference from [defendant's] failure to take the stand").
 "In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error there must be a close identification of the defendant as the person who did not become a witness. [Ex parte] Williams, [461 So.2d 852 (Ala. 1984)]; United States v. Norton, 867 F.2d 1354, 1364 (11th Cir.), cert. denied, [493] U.S. [871], 110 S.Ct. 200, 107 L.Ed.2d 154 (1989).
". . . .
 "Alabama law clearly holds that '[w]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Ala. of 1901] is violated.' Ex parte Tucker, 454 So.2d 552, 553 (Ala. 1984); Ex parte Dobard, 435 So.2d 1351, 1359 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984) (quoting Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975)). However, as asserted by the State here, the prosecutor does have the right to point out to the jury that the State's evidence does stand uncontradicted and an appropriate comment to that effect, but the comment must not cross over the line drawn by the right of a defendant not to testify at trial. [Citations omitted.]
 "In Williams, the deputy district attorney made the following statement in closing:
 " 'But there's no testimony that he was coerced into making a statement about something he didn't do. You think about that. That's very important when you think about that. There's no evidence presented on the stand that Danny Ray Williams made a statement for something he didn't do.' "
 Ex parte Williams, 461 So.2d at 853. This Court reversed the conviction, with instructions to the Court of Criminal Appeals to remand to the trial court for a new trial. We stated in Williams:
". . . .
 " 'In this case, the Court of Criminal Appeals reasoned that because a third person had witnessed the confession given by the defendant, the prosecutor's comments were aimed solely at the fact that defendant had not produced any witnesses to rebut the State's testimony that no coercion had taken place. In the case of Street v. State, 266 Ala. 289, 96 So.2d 686 (1957), the prosecutor asked the question, "[H]as anyone taken the stand and denied that the defendant signed the statement?" The State had produced two witnesses who testified that the defendant's statement had been properly executed and signed by him. The defendant produced no witnesses challenging this testimony although a sheriff who had also witnessed the alleged signing did not testify. This Court wrote, "To say that the remarks were intended to reflect only on the failure of the defendant to produce the sheriff as a witness to deny the execution is beyond *Page 92 
our reach," and, "In this case, the only person who could be expected to deny the confession was the defendant." 266 Ala. at 290, 96 So.2d at 687.
 " 'Similarly, in this case, probably the only person the jury could have expected to rebut the State's evidence that the confession was not coerced was the defendant. The prosecutor mentioned the defendant by name and said that no evidence had been presented on the stand to indicate that the confession had been coerced. Though by an indirect reference, the prosecutor did virtually identify the defendant as the person who did not take the stand. To say that the comment by the prosecutor was merely a remark that the defendant had not called someone other than himself to the stand to testify that his confession was coerced is also "beyond our reach." ' "
Ex parte Wilson, 571 So.2d 1251, 1261-63 (Ala. 1990).
Thus, in the present case, because the prosecutor's comment, especially in conjunction with his gesture towards the defense table at which the appellant was seated, constituted an indirect comment on the appellant's failure to testify and because, from the evidence presented, only the appellant could have explained why he had possession of the victim's handgun, the prosecutor's comment could have been construed as "alerting the jury to the [appellant's] opportunity to refute the State's case." Ex parte Tucker, 454 So.2d 552, 553 (Ala. 1984).
 "Clearly, the prosecutor's comments in the case at bar raise the possibility that the jury could have understood them to be a reference to the defendant's failure to testify. In our view, these comments most probably made an indelible impression upon the jury, alerting the jury to the defendant's opportunity to refute the State's case. After such a comment, a defendant must either testify, or admit guilt by silence."
Ex parte Tucker, supra, at 553. See also Williams v. State,576 So.2d 649 (Ala. 1991).
Although the Alabama Supreme Court has indicated that a prosecutor's comment on a defendant's failure to testify may be subject to the harmless error rule, the cases suggest that " 'at a minimum, the trial judge must sustain the objection, and should then promptly and vigorously give appropriate instructions to the jury.' " Ex parte Wilson, supra, at 1265, quoting Whitt v. State, 370 So.2d 736 (Ala. 1979). But see Exparte Tucker, 454 So.2d 552, 553 (Ala. 1984) (holding that although the trial court gave curative instructions, the Court "consider[ed] the comments to be so prejudicial as to be ineradicable. Beecher v. State, 294 Ala. 674, 320 So.2d 727
(1975)").
 II
Although this cause is remanded for a new trial based on an error during the guilt phase of the trial, in the interest of judicial efficiency it should also be noted that the trial court improperly found the existence of the statutory aggravating circumstance that the capital offense was committed for pecuniary gain. § 13A-5-49(6), Code of Alabama 1975. InCook v. State, 369 So.2d 1251, 1256 (Ala. 1978), it was held that this aggravating circumstance should not be applied to the capital offense of murder during a robbery, because it, in effect, condemned the defendant twice for the same culpable act. See also Ex parte Johnson, 399 So.2d 873 (Ala. 1979);Morrison v. State, 398 So.2d 730, 748 (Ala.Cr.App. 1981), reversed on other grounds, 398 So.2d 751 (Ala. 1981); Thomas v.State, 373 So.2d 1149, 1160 f.n. 1 (Ala.Cr.App. 1979), affirmed, 373 So.2d 1167 (Ala. 1979), vacated, 448 U.S. 903,100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State,380 So.2d 970, 971 (Ala.Cr.App. 1980); Colley v. State,405 So.2d 374, 389 (Ala.Cr.App. 1980), reversed on other grounds,405 So.2d 391 (Ala. 1981); Nelson v. State, 405 So.2d 392, 400
(Ala.Cr.App. 1980), reversed on other grounds, 405 So.2d 401
(Ala. 1981).
In the present case, the trial court denied the motion and took no action to eradicate the prosecutor's comment. Therefore, the judgment is due to be reversed and this *Page 93 
cause is remanded to the trial court for a new trial.
REVERSED AND REMANDED.
All Judges concur.