[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 230 
Appellant, Thomas Lewis, was first convicted on November 19, 1977, of the capital offense of robbery during the course of which the victim is intentionally killed, in violation of § 13-11-2(a)(2), Code of Alabama 1975,[1] and sentenced to death. On *Page 231 
appeal to this court, we held that the death penalty was not sustained by the evidence presented at the hearing on aggravating and mitigating circumstances. Lewis v.State, 380 So.2d 970 (Ala.Cr.App. 1979). We affirmed the conviction, but remanded the case for entry of a sentence of life imprisonment without the possibility of parole.Id. at 978. In response to our remand, the trial court held another sentencing hearing and sentenced appellant to life imprisonment without parole. On return to remand, we affirmed the conviction and sentence. Id. at 978-80. Subsequently, appellant filed a petition for writ of habeas corpus in the United States District Court for the Middle District of Alabama, claiming, inter alia, that his due process rights were violated because the preclusion clause contained in § 13-11-2, Code of Alabama 1975, prevented consideration of lesser included offenses, relying on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 (1980). On April 16, 1986, the United States District Court for the Middle District of Alabama, in accordance with Beck v. Alabama, granted appellant's petition for writ of habeas corpus and ordered that appellant be granted a new trial within sixty days or released from custody. Lewis v. Johnson, No. 85-V-0431-S Civ. (M.D. Ala., April 16, 1986).
A new trial was held within sixty days on the capital offense charged, robbery during the course of which the victim is intentionally killed, § 13-11-2(a)(2). Appellant was again convicted of the capital offense on October 9, 1986, and sentenced to life imprisonment without parole. From this second conviction, he appeals, raising ten issues.
The facts surrounding the robbery-murder are sufficiently reported in our prior decisions, Lewis v. State; Colleyv. State, 405 So.2d 374 (Ala.Cr.App. 1979), rev'd,405 So.2d 391 (Ala. 1981); and Colley v. State,436 So.2d 11 (Ala.Cr.App. 1983).[2] We deem it unnecessary to recite the facts, in full, again and will only recite those facts necessary to our discussion of the specific issues raised.
 I
Appellant contends that the trial court erred in failing to quash the jury because the state allegedly engaged in a systematic pattern of excluding qualified black venirepersons from the jury in violation of his constitutional rights, relying on Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). There were 69 prospective jurors on the panel from which the trial jury was selected. Among these were three blacks, Edward Brown, Billy R. Townsend, and Johnnie Eubanks. The state struck all three, leaving an all-white trial jury. Although the trial court did not make an initial determination that appellant had made a prima facie showing of racially discriminatory strikes, it allowed the prosecutor to give his reasons for the strikes. We will examine the reasons. See Currin v. State,535 So.2d 221 (Ala.Cr.App. 1988) (quoting with approval,United States v. Forbes, 816 F.2d 1006 (5th Cir. 1987)).
The record reflects that two of the black prospective jurors were clients or former clients of the defense counsel. The voir dire examination shows the following:
 "MR. CARLTON [prosecutor]: Are any of you friends or clients of Bruce McLean or Steve Blair, the lawyers in this case? Mr. Brown, you a client?
"JUROR BROWN: Yes, previously.
". . . . *Page 232 
 "MR. CARLTON: . . . Does anybody know the defense lawyers Bruce McLean and Steve Blair? Do you consider yourself to be friends with or friendly with the defense lawyers? (None.)
 "Have any of you ever gone to them seeking legal advice? Ever had any business dealings with Bruce McLean or Steve Blair, the defense lawyers?
". . . .
 "THE COURT: Billy R. Townsend, you raised your hand also?
 "JUROR TOWNSEND: Yes. I think he did the closing on a house for me.
"THE COURT: You think Mr. McLean or Mr. —
"MR. CARLTON: Mr. McLean or Mr. Blair?
"JUROR TOWNSEND: McLean. I think he is the one.
 "THE COURT: He did a home closing, but you are not sure? I appreciate that response. If you are not sure let us know."
In addition to striking prospective juror Townsend for having been a client of defense counsel, another reason developed during voir dire examination. The record shows the following:
 "THE COURT: Have any of you ever been the victim of a crime?. . . .
". . . .
 "THE COURT: . . . . Mr. Townsend, Mr. Billy Townsend?
"JUROR TOWNSEND: Yes.
"THE COURT: What crime were you the victim of?
"JUROR TOWNSEND: Controlled substances.
". . . .
 "THE COURT: Violation of the Controlled Substance Act. Anyone else. (None.)"
It is reasonable to conclude that Townsend misunderstood the trial court's question and responded as having been a defendant in a criminal case instead of a victim. The prosecutor informed the court that, in addition to striking Townsend because he had been a client of defense counsel, he felt that he may have had some prior trouble with the "law" as it related to drugs.
In reference to the third black prospective juror, Johnnie Eubanks, the voir dire examination disclosed uncertainty as to whether she resided within the jurisdiction of the court. She testified that she and her husband had just moved to Dale County from Calhoun County. She stated that she lived at Fort Rucker in Dale County with her husband and that her mother maintained a residence in Enterprise (Coffee County). The prosecutor advised the court that he used a peremptory strike to remove her rather than take a chance and leave someone on the jury whose qualifications might be questioned in the future, especially in light of the fact that this was potentially a death penalty case. In addition, the prosecutor stated that it appeared that Mrs. Eubanks was seizing every opportunity to stay off the jury. The record supports this conclusion.
The trial court denied appellant's motion to quash the jury panel, finding that there was no evidence that any blacks had been excluded for racially motivated reasons, but, on the contrary, were excluded for racially neutral reasons.
We find that the record reveals legitimate, nonpretextual, neutral explanations for the state's use of its peremptory challenges against the three black members of the venire. The denial of appellant's motion attacking the jury selection process on the basis of Batson v. Kentucky was proper.
 II
Appellant contends that the trial judge erred in refusing to recuse himself from hearing the case because the victim of the crime was the father of a court's bailiff, James M. Counts. James M. Counts was indeed the son of the victim, James O. Counts, Jr. The bailiff was a merit system employee, employed by the Administrative Office of Courts, and he worked on a regular basis for three circuit judges and a district judge. He had worked as a bailiff for approximately two years. The only association between the trial judge and the *Page 233 
bailiff involved the business of the court. They did not see each other socially, although the bailiff had attended a social gathering at the trial judge's home on one occasion when all the law enforcement officers in the courthouse had been invited. Counts supported the judge politically during his political campaign for office because, Counts said, "he was the best man."
Our review of the record indicates that, in this case, Bailiff Counts did not perform the duties of bailiff requiring contact with the jury and, indeed, may not have performed any of the duties of bailiff at all. The record shows that the jury was sequestered during the trial and placed under the supervision of Deputy Sheriff John Moore and a matron. The record refers to Moore as the bailiff.
Canon 3 C.(1) of the Alabama Canons of Judicial Ethics, provides, "A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned. . . ." The Canon does not require disqualification "upon mere accusation of bias unsupported by substantial fact." Taylor v.Taylor, 359 So.2d 395, 398 (Ala.Civ.App. 1978). See also Ross v. Luton, 456 So.2d 249 (Ala. 1984);Moreland v. State, 469 So.2d 1305 (Ala.Cr.App. 1985). Prejudice on the part of a judge should not be presumed. Ross v. Luton; Duncan v. Sherrill,341 So.2d 946 (Ala. 1977).
Our review of the record, particularly the evidence presented by appellant in support of his recusal motion, fails to reveal any evidence which would require the disqualification of the trial judge or cast question upon his impartiality. We find nothing to indicate a personal bias toward appellant. The relationship between the trial judge and Bailiff Counts, considered in the light of the evidence of this case, does not have the appearance of impropriety, as is urged by appellant. We also note that appellant has pointed to no occurrence during the trial, and we can find none, in which the judge acted in any way other than entirely impartially. See Murphy v. State, 403 So.2d 314
(Ala.Cr.App.), cert. denied, 403 So.2d 316 (Ala. 1981).
 III
Appellant contends that the trial court erred in admitting into evidence inculpatory statements made by him to the police while in custody, on the grounds that (1) his mental subnormality was so great that he could not have knowingly and intelligently waived his constitutional rights prior to questioning and (2) these oral statements were obtained by threats of violence and, hence, were not voluntary.
Appellant made three inculpatory statements to police which were allowed into evidence. He challenges all three. The first statement was given in an automobile on the way from Montgomery to Troy, the second was given in Troy that night, and the third was given in Enterprise the following day.
The two Troy police officers who took appellant's first statement testified that they read the warnings required byMiranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), to appellant at the police station in Montgomery when they first picked him up; that he indicated to them that he understood his rights; and that he also signed a form constituting a waiver of his Miranda
rights. The officers further testified that, when they first read appellant his rights, he had a copy of the rights and followed along as the rights were read to him. Appellant had previously been taken into custody pursuant to an arrest warrant for an unrelated offense. He was again advised of hisMiranda rights in the automobile prior to questions about the robbery-murder. The officers had learned, while in Montgomery, that a fingerprint found at the scene of the crime had been identified as appellant's.
In taking the first statement, the two Troy officers began by questioning appellant about unrelated burglaries and larcenies. They then questioned him about the robbery-murder of Counts. He stated that a third man, Robert Lee Franklin, was with him and Kelly Colley and that Franklin committed the robbery and the murder.
Later that evening and after the police learned that Franklin had an alibi, appellant *Page 234 
in the second statement stated that Franklin was not with them during the commission of the crime, but that Colley killed Counts. In the second statement, appellant admitted taking money from the cash register. Officer Steve Weekly, an agent for the Alabama Bureau of Investigation, testified that appellant was read his Miranda rights again before he made this second statement and indicated that he understood them.
The following day, appellant gave the third statement, during which time Colley was present. Officer Weekly testified that, prior to giving his third statement, he again was read his rights and indicated that he understood them. When asked who did the shooting, appellant pointed at Colley and said, "He did." Appellant admitted in this statement that he took the wallet from the victim.
All the officers testified that no promises or offers of reward were made to appellant, and that no violence, threat of violence, or coercion was directed toward appellant.
In support of his motion to suppress, appellant presented Fred George, a clinical psychologist. He testified that appellant was in the moderate mentally retarded range and had a reading I.Q. of 45. He gave his opinion that appellant would not have been able to understand the Miranda
rights on the waiver form. Appellant did not testify at the suppression hearing.[3]
In rebuttal, the state called James Corbitt, a psychologist employed by the State Department of Corrections. Corbitt's testimony contrasted sharply with George's. He testified that appellant had an I.Q. of 64 to 65 and was in a mild mentally retarded range. It was his opinion that appellant would understand his Miranda rights if they were read to him and, particularly, if he read along with the person reading the rights. Corbitt had examined appellant far more extensively than George, having seen him three times a week for several years, while George had had only an interview of one and one-half hours. The state also called Jerry Scarbrough, a Montgomery police officer, in rebuttal, who testified that he had observed appellant read theMiranda rights and sign a waiver of them in an unrelated case in the past and that, from his knowledge of appellant he obtained as a juvenile officer, he considered appellant to be "alert" and "street smart."
Appellant's contention that his statements were coerced is based on a statement made by Officer James McLendon to appellant during the taking of the second statement. During the questioning, McLendon told appellant the following: "We haven't tried to beat you up or hurt you in any way. We did not threaten you. We don't work like Montgomery does." Appellant argues that it can be implied from this that he was "beaten, threatened or hurt while in police custody in Montgomery." We assume that appellant is further arguing that these statements, coupled with the fact that he expressed a readiness to be moved to Troy, raise the inference that he made the inculpatory statements in exchange for release from the Montgomery police into custody of the Troy officers.
The oft-stated rule is that a confession is prima facie involuntary and inadmissible, and the state must show voluntariness and a Miranda predicate in order for it to be admitted. Thomas v. State, 373 So.2d 1167
(Ala. 1979), vacated on other grounds, 448 U.S. 903,100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State,295 Ala. 350, 329 So.2d 599 (1976); Magwood v.State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd,494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599,93 L.Ed.2d 599 (1986). Whether there was a waiver of the right to remain silent and the right to counsel and whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of accused — the totality of the circumstances. Thomasv. State; Magwood v. State; Chandler *Page 235 v. State, 426 So.2d 477 (Ala.Cr.App. 1982) (citingEdwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981)). The question of whether a confession was voluntary is initially to be determined by the trial court.Ex parte Singleton, 465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Magwood v. State; Marschke v.State, 450 So.2d 177 (Ala.Cr.App. 1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. State,455 So.2d 1008 (Ala.Cr.App. 1984); Bennett v. State,409 So.2d 936 (Ala.Cr.App. 1981), cert. denied, 457 U.S. 1137,102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parteMcCary, 528 So.2d 1133 (Ala. 1988); Ex parteSingleton. The fundamental requirements for voluntariness are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.Jurek v. Estelle, 623 F.2d 929 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709,68 L.Ed.2d 203 (1981); Magwood v. State; Harris v.State, 420 So.2d 812 (Ala.Cr.App. 1982). It is well settled that the mere fact that a defendant is functionally illiterate or simple-minded will not vitiate the voluntariness of his confession. Cliff v. State,518 So.2d 786 (Ala.Cr.App. 1987). The low mentality of a defendant should go to the weight and credibility of the confession rather than to its admissibility. Elrod v.State, 281 Ala. 331, 202 So.2d 539 (1967). A defendant's mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. Whittle v. State,518 So.2d 793 (Ala.Cr.App. 1987); Sasser v. State,497 So.2d 1131 (Ala.Cr.App. 1986). See generally, Annot., 8 A.L.R.4th 16 (1981). We, therefore, look to the totality of the circumstances surrounding appellant's statements to determine whether the record supports the finding of the trial court and the admission of the statements into evidence.
In the case sub judice, the evidence presented in support of appellant's claims of threats, coercion, physical abuse, and the promise for release from the Montgomery authorities was the statement of Officer McLendon quoted above and appellant's readiness to go to Troy. McLendon testified that he had no reason or basis for making the remark about the Montgomery police, and that it was just "off the cuff." The officers present when the statements were taken testified that no threats or promises were made and that no evidence of physical trauma was observed when appellant was initially picked up in Montgomery. The officers testified that, when they met him in Montgomery, appellant did not appear to be afraid; he seemed calm; he did not appear disheveled or apprehensive; and he exhibited no signs of physical abuse. They further testified that he made no complaints. There was no evidence that the officers threatened to leave appellant in Montgomery. We find no evidence from which it could be reasonably concluded that appellant was beaten, threatened, abused, or coerced in any manner, either while he was in Montgomery or after he was removed to Troy. We find that not only were the statements not obtained by physical force or threats, they were not induced by any promise.
We have reviewed the evidence presented concerning the mental subnormality of appellant and conclude that there was sufficient evidence before the trial court for it to conclude that appellant had sufficient intelligence, education, and comprehensive ability to understand his Miranda *Page 236 
rights as well as the waiver of those rights and the consequences of doing so.
We find that, upon this evidence, the trial court properly held that appellant knowingly, voluntarily, and intelligently made the incriminating statements to the police, after properMiranda warnings which were knowingly, intelligently, and voluntarily waived. The denial of the motion to suppress was proper, and the statements were properly admitted into evidence.
 IV
Appellant contends that the evidence does not sustain his conviction for the capital offense charged because there was insufficient evidence from which a jury could have concluded beyond a reasonable doubt that he intentionally killed the victim. He argues the lack of direct evidence that he shot the victim and the weakness of the circumstantial evidence connecting him with the crime.
In deciding whether or not there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State,368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877
(Ala. 1979); Bass v. State, 55 Ala. App. 88,313 So.2d 208 (1975). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v.State, 387 So.2d 280 (Ala.Cr.App.), cert. denied,387 So.2d 283 (Ala. 1980); McBryar v. State,368 So.2d 568 (Ala.Cr.App.), cert. denied, 368 So.2d 575 (Ala. 1979); 7 Ala. Digest, Criminal Law, Key No. 1159.3. The action of the trial court in denying a motion for judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could find the defendant guilty. Thomas v. State,363 So.2d 1020 (Ala.Cr.App. 1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State,447 So.2d 199 (Ala.Cr.App. 1983); Thomas v. State.
When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State; McConnell v.State, 429 So.2d 662 (Ala.Cr.App. 1983). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust. Duncan v. Sherrill; Johnson v. State,378 So.2d 1164 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173
(Ala. 1979).
In reviewing a conviction based on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State. Our responsibility in such cases is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every reasonable hypothesis except guilty beyond a reasonable doubt. "No person should be convicted, whether on circumstantial evidence or on direct evidence, unless it is shown beyond a reasonable doubt that he is guilty; on the other hand, if the state meets its burden of proof, then a jury may find a defendant guilty." Dolvin v. State, 391 So.2d 133,139 (Ala. 1980).
In the instant case, appellant admitted planning and executing the robbery with his accomplice, Colley. Although he denied shooting the victim and blamed Colley, the pistol used in the killing was recovered from appellant's sister, appellant's fingerprint was found on the victim's cash register, and eyewitness testimony placed him and his vehicle at the scene of the murder. The fingerprint on the cash register indicates that appellant was behind *Page 237 
the counter where the body of the victim was found. Appellant admitted taking the victim's wallet after the victim had been shot, and he received a share of the proceeds from the commission of the crime. The victim had been shot three times, twice in the back. This evidence, along with other circumstances surrounding the crime, strongly implicates appellant in the shooting of Counts.
"No defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine." Lewis v. State,456 So.2d 413, 414 (Ala.Cr.App. 1984) (quoting from Beck v.State, 396 So.2d 645, 662 (Ala. 1981)). "[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony." Ex parteRaines, 429 So.2d 1111, 1112 (Ala. 1982), cert. denied,460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). To affirm a finding of a particularized intent-to-kill, the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill. Id. Whether a non-triggerman aided and abetted the actual killing itself, such as by being present to render assistance in the killing itself if it becomes necessary, will almost always be a jury question. Lewis v.State. In the instant case, the jury was given proper instructions on the intent-to-kill requirement, and the law of complicity. We conclude that there was sufficient evidence from which a rational jury could have concluded that appellant possessed the intent to kill.
After examining the evidence and applying the proper standards of review, we find that there was sufficient evidence presented by the state from which the jury could have excluded every reasonable hypothesis except guilty beyond a reasonable doubt of the capital offense charged. Appellant's motion for judgment of acquittal based on the assertion of insufficient evidence was properly denied.
 V
Appellant contends in section VII of his brief that reversible error occurred when the trial court permitted Montgomery Police Officer Jerry Scarbrough to testify, over objection, that he knew appellant and Colley in 1977, and that appellant was a "leader" and Colley was a "follower." Scarbrough was a rebuttal witness for the state and based his opinion on experience he had had with appellant and Colley when he was a counselor for Vocational Rehabilitation Services.
Scarbrough first testified, without objection, that appellant had owned an automobile when he knew him in 1977; that he had heard appellant read a form waiving hisMiranda rights and had observed him sign the form; and that appellant was "alert" and "street smart." This was obviously proper rebuttal to testimony which had been presented by appellant to the effect that appellant did not have the mental capacity to understand and intelligently waive his Miranda rights. Scarbrough was then asked, of the two, which was the leader and which was the follower. Over the objections of appellant, he was permitted to answer, and he stated that appellant was the leader and Colley was the follower. Appellant objected on the grounds that the question called for a mental operation and a conclusion which the witness was not qualified to give. The prosecuting attorney contended that he expected the defense to argue that, due to appellant's mental capacity, he was led into committing the crime by Colley, who had a superior intellect, and that the state was entitled to present such testimony in anticipation of such an argument.
Neither party contends that Scarbrough is an expert witness, although he does have considerable education and training as a counselor and had considerable contact with and knowledge of appellant and Colley. We must consider Scarbrough a lay witness in reviewing this issue. The general rule is that a lay witness can testify to facts which he observed but cannot testify to opinions, conclusions, deductions, or inferences which are based upon facts.Andrews v. State, 473 So.2d 1211 (Ala.Cr.App. 1985); 3 Wharton's Criminal Evidence *Page 238 
§§ 581, 582 (C. Torcia 13th ed. 1973); R. Williams,Williams' Alabama Evidence § 156 (1967); C. Gamble, McElroy's Alabama Evidence, §§ 127.01(1)-(4) (3d ed. 1977). There are exceptions to this rule. C. Gamble, supra, at § 127.01(3).
We find that the trial court committed error by overruling appellant's objections to Scarbrough's testimony giving his opinion as to which of the perpetrators of the crime was the leader and which was the follower. We find no exception to the general rule which would permit such opinion testimony under the circumstances of this case. Had the question become relevant as to which of the men was the leader and which was the follower, it would have been the function of the jury to draw the conclusion based upon facts submitted to it. To allow the lay witness to engage in such activity invades the jury's province and usurps its function. See id. at § 127.01(2).
Even though we have found error here, we do not believe that it calls for a reversal of this case. We have examined the entire record in light of the lay opinion of Scarbrough which was erroneously admitted, and we conclude that the error did not injuriously affect a substantial right of appellant. In light of the evidence, it is highly unlikely that the opinion that appellant was the "leader" and Colley the "follower" had any effect upon the outcome of the trial. The admission was error without injury. A.R.A.P. 45.
 VI
We have reviewed the remaining issues raised by appellant and find no merit in them. We do not find them to be of sufficient importance to warrant discussion in this opinion.
Based on the foregoing, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] The 1975 capital punishment statute, as contained in §§ 13-11-1 through -9, was, upon adoption of the new Criminal Code, effective January 1, 1980, recodified in identical language as §§ 13A-5-30 through -38. These sections of the new criminal code were repealed effective July 1, 1981, by the 1981 capital offense statute, which applies only to conduct occurring on or after July 1, 1981; the repeal of §§ 13A-5-30 through -38 did not affect the applicability of those sections to conduct that occurred before July 1, 1981.
[2] Kelly Colley was an accomplice in the commission of the instant crime. The evidence shows that he and appellant committed the crime; however, each accused the other of shooting the victim. Colley also ultimately received a sentence of life imprisonment without the possibility of parole.
[3] There was some discussion during the suppression hearing about admitting testimony, including that of appellant, from prior proceedings. However, this prior testimony was never introduced and admitted.