In 1983, the Juvenile Court of Pike County ordered 17-year-old Albert Baker, Jr., transferred to the circuit court for criminal prosecution as an adult. Baker v. State,450 So.2d 470 (Ala.Cr.App. 1984).
In 1985, Baker was convicted for the capital murder of Mattie Pearl Dansby and sentenced to life imprisonment without the possibility of parole. That conviction was reversed because of the State's use of an illegally obtained confession. Baker v.State, 487 So.2d 264 (Ala.Cr.App. 1986). The defendant was retried in 1987 and was again convicted and sentenced to life without parole. He raises four issues on this appeal from his second conviction.
 I
The defendant contends that the prosecution engaged in racial discrimination in the exercise of its peremptory strikes in selecting the jury, in violation of Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when it used 19 of its 30 strikes to remove black venire persons.
Although the record shows no prior objection by defense counsel, the district attorney stated his reasons for "certain strikes." The district attorney gave the following reasons:
 1. Sybil J. Ora (# 49): During the voir dire questioning she grimaced when asked if the race of the defendant or the victim would make any difference. The State also noticed the "expression upon her face" and her "antics" when the venire was asked if it would have any bearing on their consideration if the evidence *Page 275 
showed that a black person brutally beat a white person.
 2. Sheila L. Jackson (# 38): Her brother was mentally retarded in a mild sort of way similar to the defendant and had been in trouble with the juvenile authorities. She knew the defendant and lived in the general vicinity where his family lived.
 3. Earnest L. Downing (# 27): He had convictions in the municipal court of Troy for DUI and a charge of assault.
 4. (# 5): This venire person had been charged in municipal court for harassment, menacing and disorderly conduct.
 5. Johnny Cannon (# 15): He had given police trouble in the past.
 6. Dwayne Mahone (# 45): He had at least one traffic conviction in municipal court for reckless driving and had expressed an interest in being excused from jury service.
 7. Willie J. Smiley (# 67): He had a municipal court charge of criminal mischief and because of the expressions on his face when asked about race and this particular trial.
 8. Betty J. Sellers (# 65): She had a record of petty larceny in the municipal court.
 9. Willie J. Sheffield (# 64): He had a close relative who had been in trouble with the law and "his expressions in response to questioning on the jury venire."
 10. Arthur Floranoy (# 32): "His age in this situation, his appearance to not understand some of the questions asked of him."
 1l. Russell Wilson (# 57): "His age, his appearance to the State, and the fact that he had a record in Municipal Court of violations."
 12. Annette J. McClain (# 46): "She had a record in the Municipal Court of the City of Troy, Alabama, of menacing and assault."
 13. Ernie F. Money (# 48): The State prosecuted a relative by marriage of hers for voting fraud.
 14. Mary Copeland (# 20): "[H]er relatives had been in trouble with the law, especially in the Municipal area of Brundidge, Alabama."
 15. Mary A. Scott (# 60): She "had been in trouble with the law here."
 16. Bessie S. Semore (# 62): The District Attorney "has had occasion in the past to sue her and her son."
17. Berta M. Hobdey (# 36): Demeanor and age.
 18. David Curtis (# 23): "The State primarily struck . . . [him] as a result of the State noticing him paying very little adept [sic] to the questions asked him by Defense Counsel, but not paying as adept attention to the questions asked him by the State."
 19. Gary A. Wilson (# 85): He was a corrections officer with the Elba Work Release Center. The State had information "as to his attitudes expressed to some, and overheard by his fellow workers down there, that it would be in the best interest of the State of Alabama in this particular case that we strike him."
The trial judge made the following findings:
 "First of all, the Court finds that the State's strikes have been established not to be racially motivated.
 "Number two: The Court finds that the State has not systematically excluded blacks. The Court also finds that there's a black on this jury. So, the argument of the Defense is not valid.
"* * * *
 "The State has set out proper reasons for striking those that the State struck from this jury."
The record shows that the parties struck from a list of 72 venire persons, of whom 20 were black. The State used 19 of its 30 strikes to remove black venire persons. Defense counsel struck no blacks. One black served on the jury. The District Attorney stated that he struck one white venire person because she had convictions or charges in municipal court of assault and theft.
In our opinion, the District Attorney stated adequate race-neutral reasons for his strikes. Ex parte Lynn,543 So.2d 709 *Page 276 
(Ala. 1988); Ward v. State, 539 So.2d 407 (Ala.Cr.App. 1988). See also United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987) (striking black woman whose two sons had been in trouble with the law "was more than sufficient under Batson"); UnitedStates v. Williams, 822 F.2d 512, 515 (5th Cir. 1987) (prior arrest, reputed drug use). "[A] prosecutor may use peremptory challenges when he cannot formulate and sustain a legal objection to a juror, and yet has reason to question the impartiality of a juror due to his habits and associations."United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir.), cert. denied, 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987) (one juror had brother who was in prison; another had a "poor attitude" in answering voir dire questioning).
In arguing his motion, defense counsel asked the prosecutor "to go forward and tell the Court if there are any jurors that are left on the panel now that he had information that they had been arrested for Municipal offenses, misdemeanors, or whose relatives had trouble with the police, or who they had trouble with the police." The District Attorney responded: "There are none other on this jury venire presently that I have any information on that came into my knowledge concerning any police record or trouble with the law." After the District Attorney gave this response, defense counsel did not pursue this matter.
The defendant now argues that the State failed to conduct any meaningful voir dire of the challenged venire persons and failed to ask the venire any question about municipal offenses or trouble with the law. The gist of the defendant's argument is that the State did not investigate white venire persons with as much skill, diligence, and effort as it did black venire persons.
Of course, if the defendant could prove that allegation, he could establish a Batson violation. In Lynn, 543 So.2d at 712, our Supreme Court held: "Lynn thus argues that prosecutors should be required not only to give specific reasons for striking potential black jurors, but also to demonstrate why certain venire persons were not struck. Such a right of unlimited cross-examination [of the prosecutor] would be a substantial expansion of the holding in Batson, supra, and we decline to adopt it."
"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Batson, 476 U.S. at 97,106 S.Ct. at 1723. "The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory." Branch, 526 So.2d at 623 (emphasis in original). "Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are clearly a sham or pretext." Ex parte Branch,526 So.2d 609, 624 (Ala. 1987).
Here, "after the State gave its reasons for the challenges, the petitioner failed to show that other venire persons having the same characteristics were not challenged." Lynn, 543 So.2d at 713 (Maddox, J., concurring specially). We find no clear error in the trial court's findings.
 "'[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.' Batson, supra, 476 U.S. at 97[, 106 S.Ct. at 1723]. It is within the sound discretion of the trial court to determine if the State's peremptory challenges of black jurors are motivated by intentional racial discrimination. Ex parte Jackson, 516 So.2d 768 (Ala. 1986). Moreover, the trial court's findings as to whether the defendant has established purposeful racial discrimination are to be accorded great deference on appeal, Batson, supra, 476 U.S. at 98, 106 S.Ct. at 1724, and should be reversed on appeal only if they are clearly erroneous. Ex parte Branch, 526 So.2d 609
(Ala. 1987)." Lynn, 543 So.2d at 712.
 II
The defendant argues that his motion to suppress the pair of socks and the pants found in his residence during the execution of the search warrant should have been granted because the affidavit in support of *Page 277 
the warrant was based upon information obtained during an illegal interrogation and the clothing was the "fruit of the poisonous tree." We find that the clothing was properly admitted into evidence.
Pursuant to Ala. Code 1975, § 13A-5-47, the trial judge entered written findings of fact summarizing the crime and the defendant's participation in it. The portion of those findings relevant to the present issue is as follows:
 "On August 22, 1983, before 7:10 a.m., a black person was seen by a witness standing over an object lying in the yard of Mattie Pearl Dansby. The witness at the time of his observation had been in the process of passing down the highway. According to the witness, the black person he saw standing over the object had an elongated instrument that stretched from his hands in the direction of and to the object lying on the ground. Later, and still in the early morning hours of that same day, the victim, Mrs. Mattie Pearl Dansby's bludgeoned body was discovered by her young son lying in the front yard between Mrs. Dansby's home and a store she operated. This was the same area the first above witness had described seeing the black person and the grounded object. Very distinctive footprints with an indention around the heel were observed in the vicinity of the victim's body by Pike County Sheriff Harold Anderson and other law enforcement officers.
 "After observing the victim's body and other physical conditions found at the crime scene, (i.e., the door of the victim's home open; water boiling over on the stove, signs of scuffles and etc.) the Sheriff and some Deputies went across the street to the Defendant's home to ascertain whether the Defendant's family had observed anything unusual or had any information law enforcement could use beneficial to the ongoing investigation. This was done since Defendant's family live almost directly across the street from the area in which Matie Pearl Dansby's body had been found.
 "Defendant's mother welcomed the law enforcement officers and treated them courteously answering their questions and initially having no knowledge of the happenings across the road. While at Defendant's mother's home, law enforcement officers noticed in the Defendant's mother's yard the presence of the same very distinctive footprints they had observed at the scene of the crime and asked who had made them. The Defendant acknowledged the footprints were his and proceeded to show law enforcement how his blue jeans pants cuff had turned under his barefooted heel and had made the very distinctive indention around his heel print.
 "The Defendant also told law enforcement the distinctive footprints and some other shoe prints located and seen by law enforcement at the murder scene were his as he had done some work for and frequented the home/business of the victim on occasions before the morning Mattie Pearl Dansby was murdered.
 "Later, and after earlier denials by the Defendant's mother of any knowledge of the crime scene happenings, the Defendant's mother recalled the Sheriff and a Deputy from her yard into her house and then told them she had earlier questioned her son, the Defendant as to whether he was involved in '. . . that across the road.' Defendant's mother stated that Defendant initially denied any knowledge and that Defendant had later admitted he was involved and that he had hit the victim with a stick.
 "Because of a growing crowd across the street at the murder scene and for the Defendant's safety and because of the Sheriff's admitted lack of knowledge in the area of questioning juveniles, the Sheriff asked Defendant's mother if law enforcement could take the Defendant to 'Juvenile Court' for questioning. Defendant's mother was invited and encouraged to go with her son during any questioning but Defendant's mother declined to attend.
 "When Defendant arrived at the Pike County Courthouse, he was fully advised of his 'Miranda rights' but was never advised of his COURT CREATED Alabama *Page 278 
Rules of Juvenile Procedure, Rule 11(a)(4) right to have Defendant's parent or guardian present during questioning or to communicate with his only custodial parent during questioning. (Note again: Defendant's only custodial parent (his mother) had been asked by law enforcement to go with them and to be with her son during questioning but had refused.)
 "During interrogation by Pike County Juvenile Probation Officer, Pat Smith, Defendant confessed to the murder of Mattie Pearl Dansby. The confession was declared by the Alabama Court of Criminal Appeals to have been improperly obtained and the confession was by the court not allowed by this court as evidence during this Defendant's re-trial.
 "Armed with the 'illegally obtained' Defendant's confession; the observations of the distinctive footprints found in the area of the victim's body; the statements of Defendant's mother to law enforcement that her son, the Defendant, had admitted to her he was involved with what had happened to the victim with a stick, and other independent relevant and legally obtained information and observations made by law enforcement officers while lawfully on the premises occupied by the Defendant during the investigatory stage, law enforcement officers appeared before Pike County District Judge William (Bill) Hightower and procured a search warrant which authorized the search of the Defendant's Mother's home. This court found that even if the illegally obtained evidence and all reference thereto were deleted from the affidavit submitted to the District Judge, there still would have been sufficient evidence (probable cause) to support the issuance of the search warrant by District Judge Hightower. The search warrant was obtained even though the Defendant's mother had been and was at all times cooperating with law enforcement by allowing them into her home and voluntarily providing law enforcement with helpful investigative information.
 "Law enforcement officers proceeded to Defendant's home with the search warrant and seized items that were not relevant or material to this capital offense. These items had been taken on earlier burglaries of the victim's home. They were found in Defendant's room among his personal effects and again were not allowed in evidence by the court in this case. Law enforcement officers also took into their possession a wet pair of blue jeans which blue jeans were not in Defendant's room but had been seen by law enforcement officers hanging outside the back door while law enforcement officers were lawfully on the premises during the investigatory stage. The blue jeans had been identified by Defendant's family members as being Defendant's jean.
 "The Blue Jeans were submitted for laboratory examination and ascertained to have blood on them of a different blood type as that of Defendant and the same blood type as that of the deceased victim, Mattie Pearl Dansby.
 "Later, Defendant's palm print was found inside the victim's home on an entrance door jam. Searches of the area by law enforcement led to very little additional evidence other than the existence of a missing bank bag and of its contents which the victim routinely kept in her home after work hours. Also, it was ascertained the victim routinely kept her family store's money, business purchase orders and some of her personal effects in this same missing bank bag.
 "Days later, the victim's family members while cleaning up the crime scene, house, store areas and surrounding fields and yards found a store purchase order that normally would have been kept in the missing bank bag. Subsequently, the victim's family members also found the victim's billfold which would normally have also been kept in the victim's missing bank bag. The victim's family members also later found a metal baseball bat, the property of the victim's son. The bat was submitted for laboratory examination and was found to have blood on it of the same type as the victim. Both the bat and the billfold were found by the victim's family members off of a *Page 279 
trail that circled from the murder scene around through a heavily grown up area back around and toward the direction of Defendant's home.
 "When taken into custody on the 22nd day of August, 1983, Albert Baker, Jr. was sixteen years of age."
At trial, the trial judge admitted the blue jeans and socks into evidence under the inevitable discovery rule. The judge stated:
 "This Court finds to each and every one of these items that the State has proven that and demonstrated that there is reasonable probability that the evidence that I've just enumerated would have been discovered by lawful means but for the police misconduct. They were already on another course of investigation. They had facts sufficient to obtain a search warrant based on the other information that they had gathered other than just a — a confession. They were making efforts in that direction and they continued to make efforts in that direction. The leads — making the discovery an inevitable event were possessed by police at the time of the misconduct. That is the second finding that the Court makes. And, I've already set out my reasons for that. And, number three, that the police also prior to the misconduct were actively pursuing the alternate line of investigation. I've already said that they were. And, I'll add a fourth finding of the Court. And, that's that the police or law enforcement acted in good faith in everything that they did."
"Under the inevitable discovery exception to the exclusionary rule, evidence is admissible that otherwise would be excludable if it inevitably would have been discovered by lawful means had the illegal conduct not occurred." United States v.Hernandez-Cano, 808 F.2d 779, 782 (11th Cir.), cert. denied,482 U.S. 918, 107 S.Ct. 3194, 96 L.Ed.2d 682 (1987); Nix v.Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984);Ham v. State, 540 So.2d 805, 809 (Ala.Cr.App. 1988); W. LaFave, 4 Search and Seizure § 11.4(a) (2d ed. 1987).
In his statement, the defendant admitted that he was wearing blue jeans and black socks when he had a fight with Mrs. Dansby; that after he beat her with a "stick" he returned home, changed clothes, and put the jeans and socks in the "dirty clothes."
Excluding any information obtained from the defendant's statement, at the time he obtained the search warrant Sheriff Anderson knew that the defendant worked for the victim, that the defendant lived directly across the highway from the murder scene, that the victim had suspected that the defendant was burglarizing her residence and causing her trouble, and that the defendant's footprints or shoetracks matched those found at the crime scene. Before the defendant was interrogated, Mrs. Baker told Sheriff Anderson that the defendant had admitted to her that he had hit Mrs. Dansby with a stick. Additionally, it appears from Sheriff Anderson's questions to the defendant during the interrogation, that Mrs. Baker had also told the Sheriff that the defendant had changed clothes.
Under these circumstances, we find that, apart from the information obtained from the defendant during the interrogation, Sheriff Anderson had sufficient probable cause to obtain a search warrant, that he would have done so had the defendant given him no incriminating information, and that the jeans and socks would have been discovered.
Under Nix v. Williams, 467 U.S. at 445-46, 104 S.Ct. at 2510, there is no requirement that the State prove the absence of bad faith prior to the application of the inevitable discovery exception. However, here, the State proved Sheriff Anderson's good faith.
Before the Defendant was ever taken into custody, Sheriff Anderson arranged to have a juvenile probation officer present when they arrived at the courthouse. Before the defendant was taken into custody, it was also Sheriff Anderson who asked the defendant's mother if she "minded" if they took her son to "juvenile court" and invited *Page 280 
Mrs. Baker to come with them. Although Sheriff Anderson was present, it was the probation officer who warned the defendant of his constitutional rights and who failed to advise the defendant of his additional rights under Rule 11, A.R.Juv.P. Both the juvenile probation officer and Sheriff Anderson testified at the hearing on the motion to suppress that they were not aware of the additional warnings required by Rule 11. Using all the information he had obtained, the sheriff obtained a search warrant from a district court judge. Both the affidavit and the search warrant are facially valid.
While the sheriff was conducting his investigation, other law enforcement officers were independently investigating the crime scene. George Yue with the Troy Police Department discovered two legible palm prints on the jamb of the door between Mrs. Dansby's kitchen and carport. These prints were later identified as belonging to the defendant.
We recognize that there was no specific testimony that the sheriff would have obtained a search warrant if he had not had the defendant's statement. However, we deem such a conclusion implicit in the sheriff's testimony. The State did establish that the defendant's statement was not the sole effective cause of the discovery of the jeans and socks. In that regard, the sheriff testified that "Mrs. Baker was my strongest point to get a search warrant. She had told me more than anyone else." Although the affidavit only specified the information he had received from the defendant, Sheriff Anderson testified that he also sought the warrant because of information he had received from Mrs. Baker, Winton Barefoot (who was dating the victim and who told the sheriff that the victim suspected that the defendant was burglarizing her home and causing her "trouble"), and based on the similarity of the tracks.
Under these circumstances, we believe the State carried its burden, if only minimally, of establishing by a preponderance of the evidence that the clothing ultimately or inevitably would have been discovered by lawful means. Fortier v. State,515 So.2d 101, 110-112 (Ala.Cr.App. 1987), cert. denied,484 U.S. 1043, 108 S.Ct. 776, 98 L.Ed.2d 862 (1988).
This Court has previously recognized that, although the defendant's confession was secured in violation of Rule 11, "the confession was voluntarily given." Baker, 450 So.2d 470,471 (Ala.Cr.App. 1984). Reviewing the circumstances presented in the defendant's second trial, we find that, except for the Rule 11 violation, the defendant's confession was voluntary and was made after a knowing, intelligent, and voluntary waiver of his Miranda rights. See also Musgrove v. State, 519 So.2d 565,574 (Ala.Cr.App. 1986), affirmed, Ex parte Musgrove,519 So.2d 586 (Ala. 1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024,100 L.Ed.2d 611 (1988). There is simply no evidence to support even the suggestion that Sheriff Anderson or any other law enforcement officer or agent knowingly engaged in any intentional misconduct or acted with anything less than good faith. United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405,82 L.Ed.2d 677 (1994).
Furthermore, and as a second and independent basis for admitting the clothing, we note that Oregon v. Elstad,470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), "makes clear that a failure to administer Miranda warnings, without more, does not automatically require suppression of the 'fruits' of the uncounseled statement. Where the uncounseled statement is voluntary, and thus not a product of 'inherently coercive police tactics or methods offensive to due process,' id. at 317, 105 S.Ct. at 1297, there is no fifth amendment violation and the 'fruits' may be admissible in the Government's case in chief. United States v. Bengivenga, 845 F.2d 593 (5th Cir. 1988) (en banc), cert. denied, ___ U.S. ___, 109 S.Ct. 306,102 L.Ed.2d 325 (1988); United States v. Cherry, 794 F.2d 201,207-08 (5th Cir. 1986), cert. denied, 479 U.S. 1056,107 S.Ct. 932, 93 L.Ed.2d 983 (1987); United States v. Cherry,759 F.2d 1196, 1208-10 (5th Cir. 1985)." United States v.Sangineto-Miranda, 859 F.2d 1501, 1518 (6th Cir. 1988) ("We conclude that the cocaine found in Sangineto's truck was admissible, *Page 281 
even though knowledge of the existence and whereabouts of the truck were proximately derived from a Miranda violation."). "[W]here police simply fail to administer Miranda warnings, the admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment." Sangineto-Miranda, 859 F.2d at 1518.
United States v. Patterson, 812 F.2d 1188, 1193 (9th Cir. 1987), cert. denied, 485 U.S. 922, 108 S.Ct. 1093,99 L.Ed.2d 255 (1988), held that statements obtained in violation ofMiranda could nevertheless be used to establish probable cause for a search warrant, so long as the statements were voluntary. See also United States v. Rowe, 694 F. Supp. 1420, 1426
(N.D.Calif. 1988). Indeed, in Baker, 450 So.2d at 472, this Court held that despite the Rule 11 violation, the defendant's confession could be considered in determining the existence of probable cause to transfer the juvenile defendant to circuit court for prosecution as an adult. Under these circumstances, we hold that the defendant's statement was properly used in supplying the probable cause for the search warrant.
For these reasons, we find that the motion to suppress was properly denied.
 III
Over the objection of defense counsel that the testimony was hearsay, Sheriff Anderson was permitted to testify on voir dire outside the presence of the jury that during the execution of the search warrant Mrs. Baker told him that the jeans and socks belonged to her son. Obviously, this testimony was hearsay and the objection should have been sustained. Thomas v. State,461 So.2d 16 (Ala. 1984). See also Snell v. State [Ms. 4 Div. 68, March 17, 1989] (Ala.Cr.App. 1989) (Bowen, J., dissenting). However, in the presence of the jury, Sheriff Anderson testified only that the clothing was identified by Mrs. Baker as "being the property of [a] person." Before the jury, the sheriff was neither asked nor revealed the identity of the particular person to whom Mrs. Baker said the clothing belonged. That testimony was not hearsay. C. Gamble, McElroy'sAlabama Evidence § 273.01 (3rd ed. 1977).
 IV
The trial judge properly refused to allow the defendant to introduce evidence, in an effort to exonerate himself, that on August 22, 1983, John Charles Spellman robbed and murdered Cynthia Ann Waluke. See Spellman v. State, 500 So.2d 110
(Ala.Cr.App. 1986). Other than the facts that both murders involved a robbery, involved a female victim, and were committed around the same time and general location, there was no connection established between the murder of Mrs. Dansby and that of Mrs. Waluke.
"A particular fact or collection of facts indicating guilt of one other than the accused is admissible if, but only if, the [trial judge], in the light of his own experience, feels that the whole of the offered evidence tending to show another's guilt is worth considering." C. Gamble, McElroy's AlabamaEvidence § 48.01(1) (3rd ed. 1977). Evidence of the Waluke murder was not within the res gestae of Mrs. Dansby's murder. "The accused will not be permitted to show by conjecture based on inference that another is more probably guilty than he, or might have committed the crime." H.C. Underhill, CriminalEvidence § 296 at p. 589 (Niblack 4th revised ed. 1935).
Our review convinces this Court that the defendant received a fair trial. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur. *Page 282