Lonnie McCray was indicted for murder, in violation of §13A-6-2, Code of Alabama 1975. He was found "guilty as charged in the indictment" and was sentenced to 20 years in prison. He raises four issues on appeal.
 I
The appellant contends that the State violated the mandates of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), by striking 5 of 6 black jurors from the venire. The appellant is black. The jury that convicted him was composed of 11 white persons and one black person.
The district attorney provided the following reasons for striking the 5 black jurors: When they began striking the jury, juror No. 32 walked up to the judge carrying a subpoena or some other legal papers that he had just been served. The juror appeared to be upset, and the district attorney got the impression that he wanted to know whether he could be excused from the jury. The district attorney stated that he felt the juror did not want to serve and had something else on his mind. It appears from the record that the juror had been served with papers concerning another court proceeding. Juror No. 29 went to school with the appellant's son and had known the appellant all of her life. She stated that she would be uncomfortable sitting on the jury. Juror No. 21 knew the appellant's sons and stated that he would be uncomfortable sitting on the jury. Juror No. 33 had known the appellant all of his life. He also knew Deputy Sheriff Tony Helms. When the juror acknowledged that he knew Tony Helms, he "snickered under his breath" (R. 213) and the district attorney felt that the juror was not serious about the proceedings. The district attorney stated that he also struck several white persons who also knew the appellant and his sons. Juror No. 42 had come to Geneva County from New York a month earlier. Although the court qualified him, the district attorney was not satisfied that he had been a resident of Geneva County for the past year. The district attorney felt that the juror was not a valid member of the community and would not fit in with the other jurors. The juror also wore earrings and had long hair.
Considering "all relevant circumstances," we find that the State stated sufficient race-neutral reasons. Ex parte Branch,526 So.2d 609, 622 (Ala. 1987). See also United States v.Vaccaro, 816 F.2d 443 (9th Cir.), cert. denied, 484 U.S. 928,108 S.Ct. 295, 98 L.Ed.2d 255 (1987) (juror had poor attitude when answering voir dire questioning); McGahee v. State,554 So.2d 454 (Ala.Crim.App.), aff'd, 554 So.2d 473 (Ala. 1989). (juror's statement that she did not want to serve on jury was a legitimate, non-discriminatory reason for jury strike). "[A] prosecutor may use peremptory challenges when he cannot formulate and sustain a legal objection to a juror, and yet has reason to question the impartiality of the juror due to his habits and associations." Baker v. State, 555 So.2d 273, 276
(Ala.Crim.App. 1989) (quoting, United States v. Vaccaro,816 F.2d at 457). Once the prosecutor articulates a race-neutral reason for striking a black juror, the defendant can offer evidence showing the reason is a *Page 110 
sham or pretext. Branch; Baker. After the State provided race-neutral reasons for striking the black jurors, the appellant failed to show that members of the venire who had the same characteristics were not challenged. We hold that the findings of the trial judge as to the appellant's claim of aBatson violation were not clearly erroneous. See Branch; Davisv. State, 555 So.2d 309 (Ala.Crim.App. 1989).
 II
The appellant next contends that he was unable to make a knowing and intelligent waiver of his Miranda rights and, thus, that a statement that he made to the police approximately 4 hours after the murder was involuntary and inadmissible. We note that the appellant made 3 separate statements to the police at various times. However, he has challenged only this first statement in this appeal.
The record reveals that the trial court held a suppression hearing concerning this statement. Max Motley, the jailer for Geneva County, testified that he drove the appellant to the police station shortly after the murder, which occurred at approximately 7:00 p.m. He testified that although he smelled alcohol on the appellant, he "could handle himself pretty well." (Supp.R. 7). He also testified that the appellant did not appear to be suffering from any delusions. Deputy Sheriff Tony Helms, who was called to the scene, saw the appellant again approximately 4 hours after the murder. His discussion with the appellant was taped. The appellant was read his rights and stated that he understood his rights "very well." (R. 321). Helms testified that he did not have any trouble understanding the appellant. He testified that he could smell a little alcohol on the appellant, but the appellant denied drinking for the past two months. A blood alcohol test administered approximately one hour after the statement indicated a blood alcohol level of .16 percent.
A clinical psychologist, Dr. Robert Nolin, testified for the appellant. He examined the appellant approximately 5 months after the murder. He testified that the appellant had an I.Q. of 65 and functioned in the mildly mentally retarded range. He also testified that the appellant suffered from a significant memory impairment and that his memory and mental impairment would be more severe if he had a blood alcohol level of .16 percent. He also testified that the appellant had organic brain syndrome as a result of chronic alcohol abuse.
The trial judge's order denying the appellant's motion to suppress states that "even though the defendant may be mildly mentally retarded, the Court has listened to the tape and the Court finds that the defendant knew what his rights were prior to making the statement or answering questions and he decided to answer the questions without an attorney." (R. 108). The trial judge also found that the appellant was fully informed of his rights.
The burden is on the State to show the voluntariness of a confession and a proper Miranda predicate. Lewis v. State,535 So.2d 228 (Ala.Crim.App. 1988). The voluntariness of a confession is initially for the trial court's determination.Lewis.
 "Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Even where there is credible evidence to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made."
Lewis at 235 (citations omitted). The low mentality of a defendant goes to the weight and credibility of a confession rather than to its admissibility. Lewis; Cliff v. State,518 So.2d 786 (Ala.Crim.App. 1987). *Page 111 
We also note that in order for a confession to be rendered inadmissible due to intoxication, the defendant must prove that his mind was substantially impaired at the time the confession was made. We find that there was sufficient evidence for the trial judge to find that the statement was given voluntarily and that the statement was properly admitted. See, e.g., Lewis;Whittle v. State, 518 So.2d 793 (Ala.Crim.App. 1987).
 III
The appellant contends he could not form the required intent to commit murder because of his mental condition and state of intoxication at the time of the shooting. Thus, he contends that the jury could not find him guilty of murder.
The pertinent parts of the record reveal the following: Officer Tony Helms was called to the appellant's house at approximately 7:00 p.m. on September 7, 1988. When he got there, he saw the appellant struggling with two of his sons over a shotgun. They were at the edge of the appellant's front yard. Helms jumped out of his patrol car just as the appellant's sons took the gun away from him. The victim, Raymond Sanders, had been shot and was lying in the yard. He was already dead when the police arrived. Helms testified that when he arrested the appellant, the appellant was very angry and demonstrative. The appellant stated, "I've done shot him and I'll do it again." (R. 298). Helms had not asked the appellant any questions at that point.
Later that evening, the appellant gave a statement to Helms. The appellant stated that the victim had "roughed him up" two days earlier. (322). The appellant then told Helms that "[h]e come back. I said, Raymond, don't come up on my porch now. I said don't come up on my steps now. 'I'm gonna get you, is what he said, I'm gonna get you. I ain't got enough,' that's what he said. I had my gun and I was dragging it behind me. He's a young man. I'm an old man. Then I just shot him." (R. 322-323). The appellant also told Helms he did not take any time to see if Raymond Sanders had a gun. The appellant also stated he would shoot Sanders again if he came back. He also stated that he had not had anything to drink in over two months.
The appellant gave another statement the next afternoon. He said that Sanders threatened to kill him. He stated that he and Sanders were arguing. The appellant said it looked like Sanders had a gun, but the appellant was not sure of this fact. He further stated that he did not have anything to drink on the day of the shooting but that he had drunk "a little bit" the day before. (R. 339). The appellant requested a third interview approximately 4 days after the shooting. The appellant stated that he did not know what he had done until that night and the next morning. He stated that his blood pressure was too high and he was out of his mind. He also stated that he and Sanders never had any problems and they did not have an argument.
Max Motley testified that he drove the appellant to the jail shortly after he and Helms arrived on the scene. He did not ask the appellant any questions. The appellant stated, "Mr., I killed that [expletive] because he was trying to whup up on me again." (R. 411).
Forensics tests on the shotgun indicated that the shotgun was fired from inside of a screen door and that the projectile went through the screen. Tests also indicated that either the gun was fired in excess of 30 inches from Sanders or there was an intervening object (such as a screen door) between the victim and the gun when it was fired.
A blood test indicated that the appellant's blood alcohol level was .16 percent approximately 5 hours after the murder. Laura Shevlin, a forensic pathologist for the Alabama Department of Forensic Sciences, speculated on cross-examination that at the time of the shooting the appellant's blood alcohol level may have been between .21 and .28 percent. She also testified, however, that, depending on how much food is in a person's stomach, it may take as long as 45 minutes to an hour before alcohol gets into the bloodstream. She further *Page 112 
testified that, depending on other factors, a person could be more intoxicated 2 hours after taking his last drink than at the time he took the drink.
The appellant testified that he had no intention of shooting anyone and did not have a good memory of the incident. He testified that he and Sanders had had a fight a week prior to the shooting incident. He testified that Sanders came up his front steps and he told him to stop. He further testified, "I guess I must have had the gun with me because I shot him with it." (R. 443). He further testified that he had had one drink on the day of the shooting at approximately 8:00 a.m.
Dr. Robert Nolin, a clinical psychologist who examined the appellant 5 months after the killing, testified that the appellant's I.Q. was 65 and was in the mentally retarded range. He further testified that the appellant's ability to form memory was impaired. He testified that the appellant's ability to formulate judgment would be completely impaired if he had a blood alcohol level between .21 and .28 percent. He testified that the appellant also suffered from dementia and that there was a high likelihood that the appellant was an alcoholic.
The appellant's sister testified that the appellant was drinking on the morning of the murder. She further testified that he had been drinking for more than two weeks.
On rebuttal for the State, the appellant's son, Charles McCray, testified that he drove up to his father's house and that Raymond Sanders was standing on the first step going up to the door. He said he got out of the car and thought he saw a gun in the appellant's hand. As he was telling the appellant that there was "no sense in it," he heard the gun go off. (R. 491). The jury was charged on both murder and manslaughter. We note that the jury was also sufficiently instructed on intoxication as it applies to the ability to form intent.
The appellant contends that the evidence was undisputed that, because of his mental impairment and intoxicated state, he could not form the intent to commit murder and, thus, that his conviction must be reversed. We disagree. Whether the appellant was so intoxicated and mentally impaired that it would reduce murder to manslaughter was a question for the jury. See Adamsv. State, 484 So.2d 1143 (Ala.Crim.App. 1985); Greer v.State, 475 So.2d 885 (Ala.Crim.App. 1985). Although there was evidence that the appellant was intoxicated at the time of the shooting and that he was mildly mentally retarded, there was no evidence to show, as a matter of law, that he was so impaired and intoxicated that he was incapable of forming the required intent. See Lee v. State, 439 So.2d 818 (Ala.Crim.App. 1983). Although the jury could have found the appellant guilty of manslaughter, the evidence did not compel such a finding. The jury's verdict was not against the weight of the evidence.
 IV
The appellant contends that the trial court erred in allowing the State to introduce evidence that the victim's brother was killed the same day as the victim, because, he says, such evidence was irrelevant and was designed to inflame the jury. The record reveals that on the day of the killing, the appellant's son dropped Raymond Sanders at Sanders's mother's house after work at approximately 5:30 p.m. Upon his arrival home, Sanders's mother told him that his brother had been killed earlier that day. Sanders looked shocked and, shortly thereafter, he left. Both the State and the appellant presented evidence that Sanders and the appellant had known each other for many years and were friends.
Statements made by the appellant indicated that Sanders had come to his house to finish an argument. The appellant alleged self-defense and implied that he was forced to shoot Sanders because Sanders was a young man and the appellant was in his seventies. Thus, the statement concerning the death of Sanders's brother was relevant to show that Sanders went to the appellant's house to tell him about his brother rather than to hurt the appellant. *Page 113 
"[E]vidence is relevant if it has any probative value, however slight, upon a matter at issue in the case."Mitchell v. State, 473 So.2d 591, 594 (Ala.Crim.App. 1985). The trial court has broad discretion in determining the relevancy of evidence, and its determination will not be reversed absent a clear abuse of discretion. Primm v. State,473 So.2d 1149 (Ala.Crim.App. 1985); Ward v. State,440 So.2d 1227 (Ala.Crim.App. 1983). We find no such abuse here. Even if the testimony was irrelevant, we cannot see that the appellant was harmed in any way by its admission, particularly in light of the court's oral charge which instructed the jury not to allow sympathy for the appellant or the deceased to affect the verdict. See McMahon v. State, 560 So.2d 1094
(Ala.Crim.App. 1989); Primm.
For the reasons set forth above, this case is due to be, and it hereby is, affirmed.
AFFIRMED.
All the Judges concur.